**Petition for Writ of Mandamus Conditionally Granted in Part and Denied in Part and Opinion filed December 21, 2023.**



In The

# Fourteenth Court of Appeals

---

**NO. 14-23-00147-CV**
**NO. 14-23-00148-CV**
**NO. 14-23-00149-CV**

---

**IN RE SHAWN DEANE GRUSS, AS INDEPENDENT EXECUTOR OF THE ESTATE OF MAURITA J. GALLAGHER; AND NUCLEAR SOURCES AND SERVICES, INC., Relators**

---

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**Probate Court No. 3**
**Harris County, Texas**
**Trial Court Cause Nos. 442,656, 442,656-401, and 442,656-402**

---

# O P I N I O N

In three mandamus proceedings relators Shawn Deane Gruss, as Independent Executor of the Estate of Maurita J. Gallagher and Nuclear Sources and Services, Inc. (collectively the "Gruss Parties") argue that respondent the Honorable Jason Cox clearly abused his discretion by issuing paragraphs 3 through 5 of identical interlocutory judgments rendered in three probate court cases and

that the Gruss Parties have no adequate remedy at law. The Gruss Parties seek mandamus relief directing respondent to withdraw or vacate paragraphs 3 through 5 of the judgments and to issue a declaratory judgment that (1) the Estate owns 100% of the stock of Nuclear Sources and Services, Inc. and (2) the failure to pay the purchase price for the stock discharges or excuses the Estate from any obligation to perform under the stock purchase agreement at issue. We agree that the requirements for mandamus relief have been satisfied, and we grant the mandamus relief requested in part and deny it in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Relator Nuclear Sources and Services, Inc. (the "Company") is a closely held corporation founded in 1971 by Robert Gallagher. The Company processes nuclear and other toxic waste chemicals. Before his death Robert owned 100% of the stock of the Company. Robert died on October 8, 2014, and the assets of his estate, including the Company stock, passed under the terms of his will to his surviving spouse, Maurita Gallagher.

Maurita died on August 25, 2015, and the stock of the Company became an asset of Maurita's estate. Robert's daughter, Shawn Deane Gruss, qualified as independent executor of Maurita's estate. Shawn asked her half-brother Gary W. Gallagher ("Gary"), son of Robert and a beneficiary of Maurita's Estate, to assist Shawn in handling the Company. Gary was familiar with the Company and understood aspects of its business and operation.

Gary and Shawn determined that the valuation of the Company set at the time of Robert's death was inaccurate. The Company was listed at a value of $12,600,000 in the sworn inventory of Robert Gallagher's Estate, filed on March 16, 2016, by Charles Gallagher, Independent Executor of the Estate of Robert Gallagher, Deceased. New valuations of the Company were performed that put the

value of the Company at a substantially lower price. After these valuations, the Company was valued at $1.91 million, as reflected in the sworn inventory that the Estate of Maurita J. Gallagher, Deceased (the "Estate") filed on November 25, 2016.

On August 16, 2016 (the "Date"), NSSI Acquisition Trust ("Acquisition Trust") was created for the purpose of buying 100% of the outstanding common stock of the Company (the "Shares"). On that same date, Shawn Deane Gruss, as Independent Executor of the Estate of Maurita J. Gallagher, Deceased (the "Executor") and Gary as member of the Board of Trustees of Acquisition Trust, signed a Stock Purchase Agreement (the "Agreement") effective as of May 1, 2016. The Agreement provided terms and conditions for Acquisition Trust to purchase the Shares from the Estate. The Agreement was signed in the offices of Brent R. Caldwell, a lawyer who represented the Executor when the Agreement was drafted and signed. Caldwell was also a member of the Company's Board of Directors and a member of the Board of Trustees of Acquisition Trust, as of its formation on the Date. The Executor testified that (1) on the Date, an irrevocable stock power was also signed; (2) Caldwell "had a certificate for the stock"; (3) Caldwell retained the original stock certificate; and (4) Caldwell gave Gary a color copy of the stock certificate.[1]

The Agreement provided that the aggregate purchase price for the Shares was $2,405,882.50 (the "Purchase Price"). It is undisputed that to date, Acquisition Trust has not paid the Estate any part of the Purchase Price. Various disputes arose relating to the Company, including a dispute between the Executor and Acquisition Trust as to the meaning of the Agreement's language and as to whether the Independent Executor or Acquisition Trust owns the Shares.

---

[1] No irrevocable stock power or stock certificate was part of the trial evidence.

3

## The First Case

In cause number 442,656 in Harris County Probate Court Number 3,[2] Plaintiffs Sandra Bentley, Timothy Meyers, and Christina Meyers, beneficiaries of the Estate (the "Bentley Parties"), each individually and derivatively on behalf of the Company filed claims against the Executor, Gary, Gary's son-in-law Daniel Webster Keough ("Web"), Gary's daughter Danielle Keough ("Danielle"), Caldwell, Diversified Management Services, LLC ("Diversified"), Acquisition Trust, and NSSIDMS Houston, LLC ("NSSIDMS"). In this case (the "First Case"), the Bentley Parties asserted a declaratory judgment action against all defendants seeking declarations regarding the Agreement, any purported sale of the Shares by the Executor without court approval, a Business Services Agreement, and Gary and Web's Executive Employment Agreements. The Bentley Parties also asserted (1) breach-of-fiduciary-duty claims against Gary, Web, Caldwell, and the Executor; (2) waste of corporate asset claims against Gary, Web, and Caldwell; (3) an action to rescind certain transactions against Gary, Web, and Caldwell; (4) fraud claims against Gary, Acquisition Trust, and Diversified, and (5) conversion claims against all defendants. The Executor settled the Bentley Parties' claims against her, and the Bentley Parties assigned their claims against the other defendants to the Executor. In the First Case, the Executor also asserted a crossclaim against Caldwell, Gary, and Danielle as trustees of Acquisition Trust, seeking a declaration that the Estate is the lawful owner of the Shares.

On August 13, 2019, the trial court signed a temporary injunction in the First Case enjoining Gary, Web, Danielle, Diversified, Acquisition Trust, and NSSIDMS from (1) holding themselves out as stockholders, officers, or directors of the Company, (2) taking any position contrary to the Company's current Board

---

[2] This cause number was assigned when the Executor filed an application to probate the will of Maurita Gallagher.

4

of Directors, (3) taking any action in furtherance of a sale of the Company's stock or assets, (4) making any withdrawals or authorizing any transfer of any funds from any bank or brokerage account of the Company, Diversified, or NSSIDMS, (5) taking any action as a shareholder of Acquisition Trust, and (6) engaging in any self-dealing transactions or transactions with interested parties under section 21.418 of the Business Organizations Code. The trial court ordered the Company to suspend performance of all contracts with any of the enjoined parties and ordered the enjoined parties not to take any action against the Company to enforce any purported contractual obligation of the Company without the trial court's permission.

### The Second Case

In Cause No. 442,656-401 (the "Second Case"), the Executor sued Diversified as Trustee of Acquisition Trust seeking (1) the following declaratory relief: (a) a declaration as to the rights of ownership in the Shares, and (b) a declaration that the Estate owns the Shares; (2) the following injunctive relief: (a) an injunction that Diversified not assert any position contrary to the Company's Board of Directors; (b) an injunction that Diversified not make any withdrawals or authorize any transfers from any bank or brokerage account maintained by the Company or Diversified (to the extent the Company's funds are in such accounts); (c) an injunction that Diversified not engage in any transactions that constitute self-dealing and that Diversified not otherwise enter into transactions with interested parties under section 21.418 of the Business Organizations Code; and (d) an injunction that Diversified not take any action in furtherance of a sale or potential sale of the Company to any buyer.

In the Second Case on August 13, 2019, the trial court signed a temporary injunction whose body contains the same text as the August 13, 2019 temporary injunction in the First Case. In this second temporary injunction, the trial court

5

enjoins Gary, Web, Danielle, Acquisition Trust, and NSSIDMS even though none of them is a party in the Second Case.

## The Third Case

In Cause No. 442,656-402 (the "Third Case"), the Company sued Gary, Web, Caldwell, and Diversified, asserting the following claims: (1) breach-of-fiduciary-duty claims against Gary, Web, and Caldwell; (2) money-had-and-received claims against Gary, Web, and Diversified; (3) Theft Liability Act claims against Gary, Web, and Diversified; (4) conversion claims against Gary, Web, and Diversified; (5) a negligence claim against Caldwell; and (6) a declaratory-judgment action against all defendants seeking declarations that (a) Gary and Web's Executive Employment Agreements are each void as a matter of law; (b) the Business Services Agreement between the Company and Diversified is void as a matter of law; and (c) the website "nssienvironmental.com" belongs to the Company.

The trial court did not issue any temporary injunction in the Third Case. Although the Company sought declaratory relief, the Company did not seek a declaratory judgment as to the ownership of the Shares or as to the effect of the Agreement on the transfer of ownership of the Company's stock from the Executor to Acquisition Trust.

## The Trial Court's Separate Trial Order

The Executor filed an opposed motion to consolidate the three cases, along with two cases regarding the Estate of Robert Gallagher, into a single case. The Company joined the motion. In an order entitled "Order on Shawn Deane Gruss's First Amended Motion to Consolidate Joined by [the Company]," the trial court stated that this motion came on to be heard, and then proceeded to not rule on consolidation. Instead, the trial court stated that "by agreement between counsel, two (2) issues shall be tried to the bench." The trial court ordered that "the cause of

6

action pled in [the First Case, the Second Case, and the Third Case] for a declaratory judgment as to the effect of the [Agreement] on the transfer of ownership of the [Shares] from the [Estate] to [Acquisition Trust] shall be tried to the bench on [a specified date]." The trial court also ordered that the claims in one of the cases regarding the Estate of Robert Gallagher "shall also be tried to the bench if same is necessary."[3] Although the trial court stated in this order that there was a claim in the Third Case for declaratory relief regarding the Agreement, there never has been any claim for such relief in the Third Case. Although the trial court suggested that it was ruling on the Executor's motion to consolidate, the court never ruled on this motion, and the First Case, Second Case, and Third Case remain unconsolidated. Instead of granting consolidation, the trial court effectively determined that a declaratory-judgment claim allegedly pending in the three cases should be tried together in a bench trial separate from the trial of the remaining claims in each of the respective cases. So the substance of the order is a separate trial order rather than a consolidation order.

**A Bench Trial and A Judgment**

The trial court conducted a two-day bench trial on the claims for declaratory relief allegedly pending in the three separate cases. After trial the court signed a judgment that was entered by the clerk in each of the three cases. In the judgments, the trial court stated in pertinent part:

- "The causes of action tried to the bench related only to [the Executor's] request for a declaratory judgment as to the effect of the [Agreement] on the transfer of ownership of the [Shares] from the Estate to [Acquisition Trust] in [the First Case, the Second Case, and the Third Case]."

- The trial court ordered "that pursuant to the terms of the [Agreement], the

---

[3] Apparently trying the claims in this case was not necessary because the record reflects that the trial court did not try these claims along with the declaratory-judgment claims mentioned.

Closing commenced on [the Date] ("Closing"), but has not been completed; accordingly, [Acquisition Trust] has sixty (60) days from the date of this Order to pay the Purchase Price of . . . ($2,405,882.50) to the Estate for the [Shares] as set forth in the [Agreement] between the [Estate] and [Acquisition Trust] entered into [on the Date] [and] dated effective May 1, 2016 . . . to finalize the Closing."

- The trial court ordered "that upon timely delivery of the [Purchase Price] the stock shall remain in the possession, ownership and control of [Acquisition Trust]; however, if the [trustees of Acquisition Trust] fail to pay the Purchase Price to the Estate by no later than sixty (60) days from the date of this Order, the [Agreement] is null and void and ownership of the [Shares] will vest with the Estate, which shall be declared the lawful owner of the [Shares]."

- The trial court also ordered "that in the event [Acquisition Trust] pays the Purchase Price to the Estate within sixty (60) days of this Order then all other terms of the [Agreement] shall remain in place, including but not limited to, [the Estate's] right within sixty (60) days after receipt of the Purchase Price to obtain a current Adjusted Valuation (i.e., "Fairness Opinion")."

- The trial court ordered that its "Temporary Injunction, dated August 13, 2019, is DISSOLVED."[4]

- The trial court further ordered "that the current books and records of [the Company] shall be made available to [Acquisition Trust] immediately and the parties shall cooperate to provide [Acquisition Trust] access to [the Company] at a mutually agreed date and time but no later than [within] two (2) weeks of the date of this judgment."

- The trial court ordered "that no expenditures or distributions shall be made by [the Company] other than in the ordinary course of business without prior approval of the Court."

The trial court did not rule on the parties' requests for attorney's fees but stated in the judgment that the parties could submit applications for attorney's fees as to the claims tried in the bench trial within 90 days of the date of the judgment.

The Gruss Parties timely perfected an interlocutory appeal from the identical

---

[4] Presumably the trial court meant to dissolve the temporary injunction it issued on that date in the First Case and the temporary injunction it issued on that date in the Second Case.

judgments that the trial court rendered in each of the three cases (collectively the "Judgments"). In each judgment, the trial court ordered all remaining claims in each of the three cases to be tried to the bench on a specified date, but before that date, the trial court granted the Executor's motion to abate each of the three cases pending the disposition of the interlocutory appeal in each case by the Gruss Parties. The trial court also issued findings of fact and conclusions of law.

## The Interlocutory Appeals

In the interlocutory appeals, this court concluded that it had appellate jurisdiction over paragraphs 6 and 7 of the Judgments under section 51.014(a)(4) of the Civil Practice and Remedies Code.[5] *See Gruss v. Gallagher*, —S.W.3d—,—, 2023 WL 1975016, at *1 (Tex. App.—Houston [14th Dist.] Feb. 14, 2023, no pet. h.). This court reversed paragraph 7 and the second sentence of paragraph 6 of the Judgments, declared these parts of the Judgments void for failure to fix the amount of security to be given, and order them dissolved. *Id*. After concluding that the trial court erred in granting a motion to dissolve temporary injunction in the first sentence of paragraph 6 of the Judgments, this court reversed this sentence and rendered judgment denying the motion to dissolve. *Id*. After determining that this court lacked appellate jurisdiction over paragraphs 3-5 of the Judgments, this court dismissed the Gruss Parties' fourth, fifth, sixth, and seventh issues for lack of appellate jurisdiction. *Id*. This court did not treat the appellants' brief as a petition for writ of mandamus. *Id*.

---

[5] As requested by the Gruss Parties, we take judicial notice of the original clerk's record and the supplemental clerk's records in Cause Nos. 14-21-00178-CV, 14-21-00179-CV, and 14-21-00180-CV in this court, and we consider their contents to be including in the mandamus record for this proceeding. *See In re Sowell*, No. 14-21-00387-CR, 2021 WL 4164923, at *1 n.2 (Tex. App.—Houston [14th Dist.] Sept. 14, 2021, orig. proceeding) (mem. op.) (per curiam).

## The Gruss Parties' Mandamus Petition

After this court issued its opinion and judgment in the interlocutory appeals, the Gruss Parties filed a Petition for Writ of Mandamus seeking mandamus relief as to each of the Judgments. Real parties in interest Gary W. Gallagher, Danielle Keogh, Daniel Webster Keogh, Diversified Management Services, LLC, and NSSI Acquisition Trust (collectively the "Gallagher Parties") have filed a response in opposition to the Gruss Parties' mandamus petition. Real parties in interest Brent R. Caldwell and NSSIDMS Houston, LLC have not filed a response.

## II. ISSUES AND ANALYSIS

The Gruss Parties seek mandamus relief directing the respondent to withdraw or vacate paragraphs 3 through 5 of the Judgments and to issue a declaratory judgment that the Estate owns the Shares and that Acquisition Trust's failure to pay the Purchase Price for the Shares discharges or excuses the Estate from any obligation to perform under the Agreement. To obtain mandamus relief, a relator generally must show both that the trial court clearly abused its discretion and that the relator lacks an adequate remedy at law, such as an appeal. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135–36 (Tex. 2004) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or apply the law correctly to the facts. *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam). "In determining whether the trial court abused its discretion with respect to resolution of factual matters, we may not substitute our judgment for that of the trial court and may not disturb the trial court's decision unless it is shown to be arbitrary and unreasonable." *In re Sanders*, 153 S.W.3d 54, 56 (Tex. 2004) (orig. proceeding) (per curiam). In other words, under an abuse-

10

of-discretion standard, we defer to the trial court's factual determinations if the evidence supports them, but we review the trial court's legal determinations de novo. *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding). The refusal to enforce a contract according to its terms constitutes an abuse of discretion that may be subject to mandamus relief. *See In re Prudential*, 148 S.W.3d at 135; *In re Cont'l Cas. Co.*, No. 14-10-00709-CV, 2010 WL 3703664, at *3 (Tex. App.—Houston [14th Dist.] Sep. 23, 2010, orig. proceeding) (mem. op.).

**A.   Did the trial court clearly abuse its discretion in interpreting the Agreement?**

In their sole issue, the Gruss Parties assert that the trial court committed an abuse of discretion warranting mandamus relief in refusing to enforce the Agreement according to its terms and instead awarding the relief in paragraphs 3 through 5 of the Judgments. We begin by examining the Agreement's text.

### *1.  The Agreement's Unambiguous Language*

The Agreement provides in pertinent part as follows:

[The Agreement was] made and entered on [the Date] to be effective as of May 1, 2016, by and between [Acquisition Trust] and [the Estate] for the purchase of all outstanding and issued common shares of [the Company] a Texas corporation owned by the [Estate].

1.  Acquisition. Upon the terms and subject to the conditions set forth herein, and in accordance with the relevant provisions of the Corporation Law, [Acquisition Trust] or its designee shall purchase from [the Estate] and [the Estate] hereby agrees to sell, transfer and convey to the [Acquisition Trust] [the Shares], representing one hundred percent (100%) of the current issued and outstanding common stock of the Company. The Acquisition shall follow the satisfaction of the conditions set forth in Section 4.
. . .

3.  Purchase Price.

   a. The purchase price for each share of Stock shall be Forty[-]two and 50/100 dollars ($42.50) for an aggregate purchase price of Two Million Four Hundred Five Thousand Eight Hundred Eighty[-]Two and 50/100 dollars ($2,405,882.50) (the "Purchase Price"), to be paid to the [Acquisition Trust] in cash or time deposits at or before the Closing or as otherwise mutually agreed upon by the [Estate and Acquisition Trust].

   b. This Agreement is subject to purchase price adjustments within sixty (60) days of the Closing. Within sixty (60) days, the [Estate] shall have the right to obtain an advanced fairness opinion from an independent third party which may include positive or negative adjustments from the valuation of the Company determined by Convergent Capital Appraisers (the "Adjusted Valuation"). [Acquisition Trust] shall have up to fifteen (15) months to pay any amount required from a purchase price adjustment (the "Residual"). If [Acquisition Trust] fails to pay any Residual owed then a pro rata portion of the Shares shall be returned to the [Estate]. The Residual shall be determined as follows:
      i. If the Adjusted Valuation is lower than the Purchase Price then no purchase price adjustments will be made and no Residual shall be paid.
      ii. Adjusted Valuation equal to or less than one hundred ten percent (110%) of the Purchase Price:
         1. No Residual shall be paid.

   . . .

4. Closing. The Purchase contemplated by this Agreement is irrevocable upon execution; however for the benefit of the [Estate] and [Acquisition Trust] the closing contemplated by this Agreement for the transfer of the Shares and the payment of the Purchase Price shall take place at the Caldwell Law Firm on a mutually agreeable day and time (the "Closing"). The certificates representing the Shares shall be duly endorsed for transfer or accompanied by an appropriate stock transfer. Should the [Estate] not be able to attend a physical closing and provided [Acquisition Trust] has made provisions to provide the Purchase Price to the [Estate], [Acquisition Trust] is specifically authorized, without any right to protest or relief by the

12

[Estate], to have the [Estate's] stock certificate(s) canceled and the common stock acquired issued [sic] by the Company.

. . .

11. Entire Agreement. This Agreement together with the other documents executed contemporaneously herewith, constitute the entire agreement between [the Estate and Acquisition Trust] with respect to the matters covered thereby, and may only be amended by a writing executed by [the Estate and Acquisition Trust].

. . .

14. Waiver. No waiver [or] modification of any of the terms of this Agreement shall be valid unless in writing. No waiver of a breach of, or default under, any provision hereof shall be deemed a waiver of such provision or of any subsequent breach or default of the same or similar nature or of any other provision or condition of this Agreement.

In construing a contract, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998). To ascertain the parties' true intentions, we examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one reasonable interpretation. *Id*. However, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). We cannot rewrite the contract or add to its language under the guise of interpretation. *See American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 162. Rather, we must enforce the contract as written. *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).

Both the Gallagher Parties and the Gruss Parties contend that the language of the Agreement at issue in today's case is unambiguous. We agree. Under the Agreement's unambiguous language, the acquisition of the Shares by Acquisition Trust shall occur after the satisfaction of the conditions stated in section 4 of the Agreement. Section 4 states the following conditions: (1) the closing contemplated by the Agreement for the transfer of the Shares and the payment of the Purchase Price shall take place at the Caldwell Law Firm on a mutually agreeable date and time; (2) the certificates representing the Shares shall be duly endorsed for transfer or accompanied by appropriate stock transfer; and (3) if the Estate is not able to attend a physical closing and if Acquisition Trust has made provisions to provide the Purchase Price to the Estate, Acquisition Trust may have the Estate's stock certificate canceled and have a stock certificate for the Shares issued by the Company in favor of Acquisition Trust, without any right to protest or relief by the Estate. Under the Agreement's plain text, the term "Closing" means "the closing contemplated by [the] Agreement for the transfer of the Shares and the payment of the Purchase Price," and the Closing must take place at the Caldwell Law Firm on a date and at a time agreed to by the Estate and Acquisition Trust.

Under the unambiguous language of the Agreement, Acquisition Trust must pay the Purchase Price to the Estate in cash or time deposits at or before the Closing or as otherwise mutually agreed upon by the Parties. The Agreement is subject to purchase price adjustments within sixty days of the Closing, during which time the Estate has the right to obtain an advanced fairness opinion from an independent third party. Although a purchase price adjustment may result in Acquisition Trust having to pay an amount in addition to the Purchase Price within 15 months, a purchase price adjustment does not reduce the Purchase Price or change Acquisition Trust's obligation under the Agreement to pay the Purchase

14

Price. Under its plain text, nothing in the Agreement conditions Acquisition Trust's payment of the Purchase Price on any of the following: (1) the receipt by the Estate of a fairness opinion under section 3.b., (2) the liquidation of any Estate assets, (3) the approval by the Internal Revenue Service of the valuation of the Company, (4) the cashing in of any CDs, or (5) the receipt of lender financing by Acquisition Trust.

### 2. *Finding of Fact 27*

In finding of fact 27, the trial court states as follows:

> Paragraph 4 is clear and unambiguous with regard to the fact that the [Purchase Price] need not have been provided prior to the transfer of the stock from the Estate to [Acquisition Trust]. To have specific authority to have the stock issued "without any right to protest or relief" by the Estate, [Acquisition Trust] merely had to make "provisions to provide the [Purchase Price]" versus providing or transferring the [Purchase Price]. This is also informed by the language of Paragraph 3.b., which concerns a right for the Estate to obtain a fairness opinion within 60 days of Closing.

The Gruss Parties assert that this finding is erroneous and based on an incorrect interpretation of the Agreement and that the last sentence of section 4 does not apply in today's case.

The Gruss Parties have placed in the mandamus record reporter's records from a temporary-injunction hearing and other hearings, but the testimony from these hearings was not offered or admitted into evidence at trial, nor were all of the exhibits from these hearings offered or admitted into evidence at trial. In this context, we must limit our review to the evidence from the trial that led to the Judgments challenged in this mandamus proceeding, and we may not consider the evidence from the other hearings, except to the extent that evidence also was admitted at trial. *See, e.g., Wilson v. Wilson*, 132 S.W.3d 533, 538–39 & n. 3 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (holding that testimony from earlier temporary-injunction hearing, not offered at default judgment hearing, must be

15

offered into evidence to be considered as evidence in support of final affirmative relief).

In the last sentence of section 4 of the Agreement, the parties agree that "**Should the [Estate] not be able to attend a physical closing** and provided Acquisition Trust] has made provisions to provide the Purchase Price to the [Estate], [Acquisition Trust] is specifically authorized, without any right to protest or relief by the [Estate], to have the [Estate's] stock certificate(s) canceled and the common stock acquired issued by the Company" (emphasis added). We presume, without deciding, that Acquisition Trust made provisions to provide the Purchase Price to the Estate. Even under this presumption, under the unambiguous language of the Agreement, the last sentence of section 4 only applies if the Estate is not able to attend a physical closing. *See In re Wilmer Cutler Pickering Hale & Dorr LLP*, No. 05–08–01395–CV, 2008 WL 5413097, at *4 (Tex. App.—Dallas Dec. 31, 2008, orig. proceeding [mand. denied]) (mem. op.). No trial evidence showed that the Estate was not or is not able to attend a physical closing. In finding of fact 27 the trial court abused its discretion and contradicted the Agreement's unambiguous language by stating that to have specific authority to have the stock issued "without any right to protest or relief" by the Estate, Acquisition Trust merely had to make "provisions to provide the [Purchase Price]."[6] *See id.*

---

[6] The trial court said that its conclusion in this regard was also informed by the language of section 3.b., concerning the Estate's right to obtain a fairness opinion within 60 days of Closing. Under the Agreement's plain text, although a fairness opinion may result in a purchase price adjustment, under which Acquisition Trust must pay an amount in addition to the Purchase Price within 15 months, any fairness opinion or purchase price adjustment cannot reduce the Purchase Price or change Acquisition Trust's obligation under the Agreement to pay the Purchase Price. Nothing in section 3.b. provides that Acquisition Trust need not pay the Purchase Price before receiving the Shares from the Estate. Nothing in the Agreement conditions payment of the Purchase Price by Acquisition Trust on the receipt of a fairness opinion.

### 3. Challenges to the Trial Court's Findings that the Closing began on the Date and that Acquisition Trust took Possession and Delivery of a Stock Certificate for the Shares

In fact finding 21, the trial court found that on the Date, Acquisition Trust "took physical possession and delivery" of a stock certificate showing all the Shares were owned by Acquisition Trust ("Stock Certificate"). In fact finding 22, the trial court found that (1) the Stock Certificate "was also delivered by providing Gary Gallagher with a copy of the certificate."; and (2) "As . . . [a] member of the board of trustees of [Acquisition Trust], Mr. Caldwell retained the original [Stock Certificate], and it remains in his possession." In fact finding 28, the trial court found that "Closing commenced on [the Date], when the [Agreement] was executed and became irrevocable." In fact finding 31, the trial court again stated that the Closing commenced on the Date. In the Judgments, the trial court determined that the Closing had commenced on the Date and had not been completed. In fact finding 37, the trial court found that "the filing of this suit did not transfer the [Shares] back to the Estate," thus indicating that the Estate had previously transferred the Shares to Acquisition Trust. The Gruss Parties argue that the trial court abused its discretion in interpreting the Agreement and that the trial evidence is legally insufficient to support each of these findings.

Gary testified at trial as follows:

- When the Agreement was executed, the Company owned 2.4 million dollars of certificates of deposit ("CDs"). Gary planned to cash in CDs owned by the Company and then use the proceeds as collateral for a loan that would fund Acquisition Trust's payment of the Purchase Price at some point in the future. Gary called this planned purchase a "leveraged purchase" and a "leveraged buyout."

- When the Agreement was executed, the CDs had not been cashed in yet, and it proved very difficult to cash in the CDs because Gary did not have authority to cash in the CDs even though they were the Company's CDs. Robert and Maurita Gallagher were the signatories on the CDs, and they

17

were both deceased. According to Gary, only the Estate could cash in these CDs. By January or February of 2019 Gary "conclusively knew" that the Company's CDs "had disappeared."

- Gary indicated that Acquisition Trust was not able to pay the Purchase Price on the Date.

- Acquisition Trust still was not in a position to pay the Purchase Price on April 2, 2019, or within 45 days of that date.

- At the time of trial (February 2021), Gary stated he was in the process of seeking a loan to help finance Acquisition Trust's payment of the Purchase Price.

- There never was an "otherwise mutually agreed upon by the parties" date for payment of the Purchase Price under section 3.a. of the Agreement.

- Gary does not remember "whose idea was it to set August the 16th, 2016, as the closing date."

- When asked whether the Date was the mutually agreeable date for the Closing, as defined in the Agreement, Gary indicated that the Date was the mutually agreeable date for "[t]he transfer of the stock and the completion of these document[s]."

- Caldwell, on behalf of the Estate, never complained to Gary about Acquisition Trust's failure to pay the Purchase Price. Caldwell understood why the payment had not been made.

Caldwell testified at trial as follows:

- John Cruz, the Company's President, and Brenda Knight, the Company's Treasurer, were able to cash in the Company's CDs, the proceeds of which Gary had planned to use as collateral for a loan that would fund Acquisition Trust's payment of the Purchase Price. Caldwell thinks that this occurred in the summer of 2018. Cruz used the proceeds of the CDs for some other purpose.

- Caldwell communicated with the beneficiaries of the Estate. He made sure that the beneficiaries understood that Caldwell was not representing them and that he was representing the Estate only.

- After the Estate became the owner of the Shares, Gary, Web, and Caldwell were appointed as the members of the Company's board of directors. Caldwell took "an active role" as "a representative of the [E]state on the Board."

18

- Up to the meeting in his office on the Date, Caldwell considered his role to be that of "an independent representative of the [Estate]."

- Caldwell never made a demand on Gary to pay the Purchase Price because Gary was waiting on the Estate to get the fairness opinion under section 3.b. of the Agreement and that was clear from before the "closing."

- Caldwell noted that section 4 of the Agreement contains the definition of "Closing," a defined term in the Agreement, but that definition differs from how Caldwell defines this term.

- Caldwell does not construe the definition of "Closing" in the Agreement as contemplating both the transfer of shares and the payment of the Purchase Price.

- Caldwell recalls that "both sides of the transaction were pushing to close — or to sign everything [on the Date]." "So they agreed to show up at [Caldwell's] office on [the Date], to sign the documents and to close the transaction."

- The Trust Agreement that created Acquisition Trust was signed on the Date in Caldwell's office.

- Caldwell reviewed and suggested revisions to the documents related to the creation of Acquisition Trust, and in doing so he was acting as lawyer for the Estate. "The only role [Caldwell] had" was as "an attorney for Shawn."

- Acquisition Trust was created on the Date, and Caldwell was not a trustee of Acquisition Trust until the Date.

  The Executor, Shawn Deane Gruss, testified at trial as follows:

- Though section 3.a. of the Agreement allows the parties to agree that Acquisition Trust will pay the Purchase Price at a time other than at or before the Closing, there was no such agreement.

- Caldwell served as the Estate's lawyer from February 2016 through October 2019.

- Caldwell and Gary worked together to create the Agreement and the irrevocable stock power that were signed on the Date, and the Executor did not have anything to do with those documents.

- All the Executor did was show up at Caldwell's office on the Date. The Executor had not seen a draft of the Agreement prior to reading and signing the final draft in Caldwell's office on the Date.

19

- Caldwell set the "closing" for the Date. There was no discussion in Caldwell's office about the payment of the Purchase Price, and although the Executor thought that the Estate would be paid the Purchase Price on the Date, no payment was made.

- The Executor's understanding about the mutually agreeable date and time for the closing contemplated by the Agreement "would have been August 16th."

- At Caldwell's office on the Date, the Agreement and an "irrevocable stock power" were signed. Caldwell made copies of these documents.

- Caldwell also "had a certificate for the stock." Caldwell retained the original stock certificate, and gave Gary a color copy of it, so Gary could "have access to the [Company] accounts."

- The Estate did not receive the Purchase Price on the Date, and the Estate still has not received the Purchase Price.

In its Judgments and Findings of Fact and Conclusions of Law, the trial court concluded that the Estate transferred possession, ownership, and control of the Shares to Acquisition Trust on the Date. The trial court relied on its findings that (1) on the Date, Acquisition Trust took physical possession and delivery of the Stock Certificate; (2) the Stock Certificate was also delivered by providing Gary Gallagher with a copy of the certificate; and (3) as a member of the board of trustees of Acquisition Trust, Caldwell retained the original Stock Certificate, and it remains in his possession.

The trial evidence does not contain a copy of the stock certificate or the irrevocable stock power. There is little trial testimony regarding these documents. The Executor testified that an irrevocable stock power was signed on the Date, but she did not address what this stock power provided. No trial evidence addressed any of the terms of the stock power. The Executor testified that Caldwell "had a certificate for the stock," that Caldwell retained the original stock certificate, and gave Gary a color copy of it, so Gary could "have access to the [Company] accounts." Again, there was no evidence as to what this stock certificate provided

20

or as to whether the stock certificate reflected that Acquisition Trust owns the Shares. There was no evidence that Caldwell took possession of or retained the original of this stock certificate in his capacity as a member of Acquisition Trust's Board of Trustees. No witness testified as to whether the Company canceled the stock certificate showing that the Estate owned the Shares or whether the Company's records reflect that that Acquisition Trust owns the Shares or that the Company issued a stock certificate in favor of Acquisition Trust. Under the plain text of the Agreement, the parties contemplated that the closing would include the transfer of the Shares from the Estate to Acquisition Trust and the payment of the Purchase Price by Acquisition Trust to the Estate at or before the Closing. No trial evidence showed that the parties mutually agreed that the Estate would transfer possession, ownership, or control of the Shares to Acquisition Trust before Acquisition Trust paid any of the Purchase Price. Acquisition Trust did not pay any part of the Purchase Price on the Date or at any time before trial. Thus, no trial evidence shows that Acquisition Trust was entitled to obtain possession, ownership, or control of the Shares on the Date. We conclude that there is no trial evidence that (1) the Estate transferred possession, ownership, or control of the Shares to Acquisition Trust on the Date; (2) on the Date, Acquisition Trust took physical possession and delivery of the Stock Certificate; (3) the Stock Certificate was delivered by providing Gary with a copy of the certificate; and (4) as a member of the board of trustees of Acquisition Trust, Caldwell retained the original Stock Certificate. *See Greenspun v. Greenspun*, 211 S.W.2d 977, 985 (Tex. Civ. App.—Fort Worth 1948, writ ref'd n.r.e.) (holding there was no evidence that any stock or certificate evidencing stock was transferred to appellee). Therefore, the trial court clearly abused its discretion by ruling that the Shares are in the possession, ownership, and control of Acquisition Trust and in failing to declare that the Estate owns the Shares. *See In re Kuraray America, Inc*., 656

21

S.W.3d 137, 144 (Tex. 2022). As to the trial court's determination that the Closing commenced on the Date and had not been completed as of the date of the Judgments, Caldwell and Gary both called the meeting at Caldwell's office on the Date a "closing," and Gary indicated that the Date was the "closing date." But using this label to describe the meeting at Caldwell's office does not constitute evidence that the meeting falls within the Agreement's definition of "Closing." When asked whether the Date was the mutually agreeable date for the Closing, as defined in the Agreement, Gary indicated that the Date was the mutually agreeable date for "[t]he transfer of the stock and the completion of these document[s]," without stating that the Date was a mutually agreeable date for the payment of the Purchase Price. Thus, Gary did not agree that the meeting falls within the Agreement's definition of "Closing." Caldwell testified that the Agreement's definition of "Closing" is not how he defines this term. Caldwell also indicated that his definition of "to close" was to sign all the papers, without any requirement that Acquisition Trust pay the Purchase Price: "both sides of the transaction were pushing to close -- or to sign everything [on the Date]." Thus, Caldwell's statement that both sides "agreed to show up at [Caldwell's] office on [the Date], to sign the documents and to close the transaction" does not constitute testimony that the Date was a mutually agreeable date for the "Closing," as defined in the Agreement.

It is not surprising that Gary and Caldwell did not testify that the Date was a mutually agreeable date for the "Closing," as defined in the Agreement. Acquisition Trust was not created until the Date, and not only could Acquisition Trust not have paid the Purchase Price before the Date, Gary and Caldwell indicated in their testimony that Acquisition Trust could not have paid the Purchase Price on the Date.

Though the Executor indicated that she understood that the Closing would

take place on the Date, she also testified that she was not involved in the drafting of the Agreement and that she showed up at Caldwell's office because Caldwell told her to do so. The Executor did not testify that she or Caldwell had agreed with Gary or Acquisition Trust that the "Closing," as defined in the Agreement would take place on the Date.

Under the Agreement's plain text, the term "Closing" means "the closing contemplated by [the] Agreement for the transfer of the Shares and the payment of the Purchase Price," and the Closing must take place at the Caldwell Law Firm on a date and at a time agreed to by the Estate and Acquisition Trust. The closing contemplated by the Agreement is the transfer of the Shares from the Estate to Acquisition Trust at closing, and the payment of the Purchase Price by Acquisition Trust to the Estate at or before the closing.[7] The Agreement does not set a specific date for the Closing or a date by which the Closing must occur. Instead, the Agreement provides that the Closing shall take place at a "mutually agreeable" date and time. Thus, the parties provided that they would agree to a date on which the Estate would transfer the Shares to Acquisition Trust and by which Acquisition Trust would pay the Purchase Price to the Estate.

There was no evidence that the parties agreed that Acquisition Trust would pay the Purchase Price otherwise than "at or before the Closing" and the Agreement defined "Closing" as the transfer of the Shares and the payment of the Purchase Price. Thus, any trial testimony that the Date was a mutually agreeable date to transfer the Shares and sign the documents without payment of the

---

[7] Though the Agreement allows the Estate and Acquisition Trust to agree that the Purchase Price will be paid after the Closing, the trial court did not find that the parties so agreed, and there was no evidence at trial of such an agreement. Nor was there any evidence of a modification or amendment to the Agreement.

Purchase Price does not constitute testimony that the Date was a mutually agreeable date for the "Closing," as defined in the Agreement. The Estate sent a letter dated April 2, 2019, in which the Estate demanded that Acquisition Trust pay the Purchase Price to the Estate within 45 days. In this letter, the Estate made no mention of a Closing under the Agreement and did not seek an agreement as to a date and time for such a Closing. There was no evidence that the parties ever agreed to a date and time on which the Estate would transfer the Shares to Acquisition Trust and by which Acquisition Trust would pay the Purchase Price to the Estate. There was no evidence at trial that the Estate and Acquisition Trust ever agreed to a date and time for the Closing under the Agreement.[8]

We conclude that there is no trial evidence to support the trial court's findings (in findings of fact 28 and 31) that the Closing commenced on the Date. The trial court clearly abused its discretion in determining that the Closing had commenced on this Date and had not been completed as of the date of the Judgments. *See In re Kuraray America, Inc.*, 656 S.W.3d at 144. Though we agree with the Gruss Parties that the trial court abused its discretion in determining that the Closing commenced on the Date and had not been completed as of the date of the Judgments, we disagree with the Gruss Parties' argument that the Closing occurred on the Date and that Acquisition Trust breached the Agreement by failing to pay the Purchase Price on or before the Date. For the reasons stated above, we also disagree with the Gruss Parties' contention that the trial evidence is legally insufficient to support a finding that the Estate and Acquisition Trust did not agree

---

[8] The Gallagher Parties argue that the Executor prevented performance of the Agreement and materially breached the Agreement by refusing to set a mutually convenient date and time for Acquisition Trust's payment of the Purchase Price. The trial court did not rely on this argument either in the Judgments or in its Findings of Fact and Conclusions of Law. In addition, the Gallagher Parties do not argue that the Executor prevented performance of the Agreement and materially breached the Agreement by refusing to agree to a date and time for the Closing under the Agreement.

that the Closing would be on the Date. *See id*. Because there was no evidence at trial that the Estate and Acquisition Trust ever agreed to a date and time for the Closing under the Agreement[9] and no evidence that the parties agreed that Acquisition Trust did not have to pay the Purchase Price at or before the Closing, no trial evidence shows that the Closing, as defined in the Agreement, occurred on the Date. *See id.*

### 4. Finding of Fact 41 and Conclusion of Law 45

In finding of fact 41, the trial court stated as follows:

> Substantial evidence and testimony was presented by [Acquisition Trust] that the delay in making payment under the [Agreement] was reasonable under the circumstances and accepted by the parties as reflected by their actions in the subsequent performance of the contract. Substantial evidence and testimony was also presented that the parties never reached a mutually agreeable date and time to conclude the closing.

In conclusion of law 45, the trial court determined as follows:

> The [Agreement] did not require payment for the stock to be delivered contemporaneously with the transfer of the stock at closing. Rather, it

---

[9] The Gruss Parties assert that the trial court abused its discretion because Acquisition Trust's failure to pay the Purchase Price for the Shares discharges or excuses the Estate from any obligation to perform under the Agreement. Not only is there no trial evidence that the Estate and Acquisition Trust ever agreed to a date and time for the Closing under the Agreement, there is also no trial evidence that the Estate notified Acquisition Trust that the Estate was rescinding the Agreement based on Acquisition Trust's alleged breach of the Agreement. *See Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex.1982) (holding that, despite election-of-remedies doctrine in *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848 (Tex. 1980), nonbreaching party had to decide whether to rescind the contract or seek to enforce it when the material breach occurred, rather than waiting until after trial and before judgment to decide, and stating that nonbreaching party waived its right to rescind the contract based on the other party's material breach by (1) treating the contract as still in effect following the material breach and (2) by filing suit to enforce the contract); *Gupta v. Eastern Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 757–58 (Tex. App.-Houston [14th Dist.] 2004, pet. denied) (holding that, as a matter of law, nonbreaching party was bound by the contract despite other party's material breach because nonbreaching party continued to demand performance under the contract following the material breach).

required payment on a mutually agreed upon date and time.

In its findings and conclusions, the trial court determined that the last sentence of section 4 applied to today's case and that because Acquisition Trust made provisions to provide the Purchase Price to the Estate, Acquisition Trust was authorized under section 4 of the Agreement to receive the Shares without payment of the Purchase Price and then to pay the Purchase Price on a mutually agreed upon date and time. The trial court found that the Estate and Acquisition Trust never agreed on a date and time for the payment of the Purchase Price by Acquisition Trust. The trial court also determined that Acquisition Trust's delay in paying the Purchase Price was reasonable.

As discussed in section II.A.2. above, under the unambiguous language of the Agreement, the last sentence of section 4 only applies if the Estate is not able to attend a physical closing. *See In re Wilmer Cutler Pickering Hale & Dorr LLP*, 2008 WL 5413097, at *4. No trial evidence showed that the Estate was not or is not able to attend a physical closing. Therefore, the trial court abused its discretion by concluding that the last sentence of section 4 applies and authorizes Acquisition Trust to receive the Shares without payment of the Purchase Price.

In addition, the part of the Agreement that mentions a mutually agreeable date and time (section 4's first sentence) refers to both the payment of the Purchase Price and the transfer of the Shares at the Closing: "the closing contemplated by this Agreement for the transfer of the Shares and the payment of the Purchase Price shall take place at the Caldwell Law Firm on a mutually agreeable day and time (the 'Closing')." Mirroring the trial court's incorrect construction of section 4's first sentence, in their mandamus response, the Gallagher Parties assert that the Agreement "states, again in paragraph 4, that 'payment of the purchase price shall

26

take place at the Caldwell Law Firm on a *mutually agreeable day and time*."[10] This selective quotation from section 4 obscures the fact that the subject of the predicate "shall take place at the Caldwell Law Firm on a mutually agreeable day and time" is the closing for both the transfer of the Shares and the payment of the Purchase Price, not just the "payment of the purchase price."

Because section 4's last sentence does not apply to today's case and because there is no evidence that the parties "otherwise mutually agreed" as to payment of the Purchase Price under section 3.a., the Agreement required that Acquisition Trust pay the Purchase Price at or before the Closing to take place at a mutually agreeable date and time. Therefore, the trial court's conclusion of law 45 is based on an incorrect construction of the Agreement, and the trial court clearly abused its discretion in making conclusion of law 45. *See In re Longoria*, 470 S.W.3d 616, 625, 631, 636 (Tex. App.—Houston [14th Dist.] 2015, orig. proceeding).

The Gruss Parties assert that the trial court clearly abused its discretion in making finding of fact 41. This finding appears to be in support of the trial court's conclusions of law 46 and 48, in which the court determined that the parties never mutually agreed to a date and time for payment of the Purchase Price and that "[t]here was not any unreasonable delay in payment for the stock certificate sufficient to invalidate the [Agreement]." The Gruss Parties argue that this conclusion of law is erroneous and that the evidence is legally insufficient to support the conclusion that Acquisition Trust's failure to pay any part of the Purchase Price from the Date through the trial court's findings and conclusions on May 3, 2021, is reasonable. The Gruss Parties also assert that in determining a reasonable time for performance, the trial court erred in considering facts and circumstances that occurred after execution of the Agreement on the Date.

---

[10] emphasis added by the Gallagher Parties

If parties enter into a contract without explicitly mentioning a time for performance, courts imply that performance must occur within a reasonable time. *See Hall v. Hall*, 308 S.W.2d 12, 16 (Tex. 1957). In making this determination, we frame our inquiry in terms of what is a reasonable time for performance "in light of the circumstances before [the parties] at the date of the contract," considering all the circumstances surrounding the adoption of the agreement, the situation of the parties, and the subject matter of the contract. *Metromarketing Servs., Inc. v. HTT Headwear, Ltd.*, 15 S.W.3d 190, 195–96 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (quoting *Hall*, 308 S.W.2d at 16–17). If the evidence regarding the facts material to the question of what is a reasonable time is undisputed, courts may decide this question as a matter of law. *See Pearcy v. Environmental Conservancy of Austin & Cent. Tex., Inc.*, 814 S.W.2d 243, 246 (Tex. App.—Austin 1991, writ denied). Facts arising after the formation of the contract may not be considered in determining what constitutes a reasonable time for performance. *See Hall*, 308 S.W.2d at 17; *Metromarketing Servs., Inc.*, 15 S.W.3d at 196. Thus, facts occurring after the Date, such as the facts mentioned in findings of fact 32, 33, 34, and 41, may not be considered in determining a reasonable time for performance.[11]

Finding of fact 41 is based on the incorrect premise that the Closing commenced on the Date. As discussed above, there was no evidence at trial that the Estate and Acquisition Trust ever agreed to a date and time for the Closing under the Agreement, and the trial court clearly abused its discretion in

---

[11] In finding of fact 32, the trial court found that "[t]he IRS did not issue its approval letter until October 2018." In finding of fact 33, the trial court found that "[e]fforts to obtain a fairness opinion continued from closing until the fall of 2018 unsuccessfully." In finding of fact 34, the trial court found that "[t]he redemption of the Certificates of Deposit (Estate assets that comprised the leveraged portion of the sale) became a daunting task because both original signers were deceased; additionally, these CDs were issued by multiple small obscure banks throughout Texas each with different requirements to authorize redemption." In finding of fact 41, the trial court considered the parties' "actions in the subsequent performance of the contract."

determining that the Closing commenced on the Date. Because the Estate and Acquisition Trust entered into the Agreement without explicitly mentioning a time for them to agree to a date and time for the Closing, we imply a reasonable time for the parties to do so. *See Hall*, 308 S.W.2d at 16–17. Thus, the question regarding reasonable time for performance is not what constitutes a reasonable time for Acquisition Trust to pay the Purchase Price, the question is what constitutes a reasonable time for the parties to agree to a date and time for the Closing.[12] *See id.*; *Metromarketing Servs.*, 15 S.W.3d at 195–96. Between the Date and the date on which the trial court issued the Judgments, more than four years and seven months passed. It is not difficult to agree to a date and time for the Closing. Under the Agreement's unambiguous language, the Estate only has until sixty days after the date of the Closing to obtain a fairness opinion under section 3.b. Under the Agreement's plain text, if Acquisition Trust must pay the Estate a Residual amount in addition to the Purchase Price due to a purchase price adjustment under section 3.b., Acquisition Trust must pay the Residual within fifteen months. Presuming for the sake of argument that time was not of the essence, the trial evidence shows as a matter of law that in light of the circumstances before the Estate and Acquisition Trust on the Date, considering all the circumstances surrounding the adoption of the Agreement, the situation of the parties, and the Agreement's subject matter, and not considering facts arising after the Date, a reasonable time for the parties to agree to a date and time for the Closing had passed by the time the trial court issued the Judgments.[13] *See Ganguly Holdings, L.L.C. v. Ker-Seva Ltd.*, No. 05-21-

---

[12] Because it found that the Closing commenced on the Date, the trial court did not make a finding as to what constitutes a reasonable time for the parties to agree to a date and time for the Closing.

[13] The parties' failure to agree to a date and time for the Closing within a reasonable time does not make the Agreement revocable or conflict with the part of the Agreement stating that the Agreement is irrevocable upon execution.

00124-CV, 2022 WL 3024320, at *5 (Tex. App.—Dallas Jul. 29, 2022, no pet.) (concluding that as a matter of law a reasonable time for performance under the contract had passed after two years) (mem. op.); *Pearcy*, 814 S.W.2d at 246–47. Thus, the Agreement has expired. *See Pearcy*, 814 S.W.2d at 246–47; *Hamilton v. Shirley-Self Motor, Co.*, 202 S.W.2d 952, 954 (Tex. Civ. App.—Fort Worth 1947, writ ref'd n.r.e.) (concluding that reasonable time for performance ended after two-and-a-half years and that after that time the obligation to perform under the contract ceased). The Estate has no obligation to sell, transfer, or convey the Shares to Acquisition Trust under the Agreement, and Acquisition Trust has no obligation to purchase the Shares from the Estate or to pay the Purchase Price. *See Pearcy*, 814 S.W.2d at 246–47; *Hamilton*, 202 S.W.2d at 954.

## B.  Do the Gruss Parties lack an adequate remedy at law?

The Gruss Parties argue that they have no adequate remedy at law. Courts determine the adequacy of an appellate remedy by balancing the benefits of mandamus review against the detriments. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding). Because this balance depends heavily on circumstances, courts look to principles for guidance rather than rely on simple rules that treat cases as categories. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 464 (Tex. 2008) (orig. proceeding). In evaluating benefits and detriments, the court is to consider (1) whether mandamus will preserve important substantive and procedural rights from impairment or loss, (2) whether mandamus will "allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments," and (3) whether mandamus will spare the litigants and the public "the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding).

30

An appellate remedy is not inadequate just because the appeal involves more expense or delay than obtaining mandamus relief. *Id*.

In the third paragraph of the Judgments, the trial court decreed that Acquisition Trust has sixty days to pay the Purchase Price to the Estate for the Shares. In the fourth paragraph of the Judgments, the trial court ordered that upon timely delivery of the Purchase Price to the Estate the Shares "shall remain in the possession, ownership and control of [Acquisition Trust]." In the fifth paragraph, the trial court also adjudged that in the event Acquisition Trust pays the Purchase Price to the Estate within sixty days, then all other terms of the Agreement shall remain in place, including but not limited to, the Estate's right within sixty days after receipt of the Purchase Price to obtain a fairness opinion under section 3.b. of the Agreement.

In the interlocutory appeals, this court concluded that it lacked appellate jurisdiction over paragraphs 3-5 of the Judgments. *See Gruss*, —S.W.3d at —, 2023 WL 1975016, at *4–11. The Judgments are interlocutory, and there are remaining claims to be adjudicated by the trial court. If the Gruss Parties must wait to appeal from a final judgment in each of the trial court cases, the final judgment would most likely be issued after the expiration of the sixty-day time period set up in the Judgments, perhaps well after. If Acquisition Trust were to pay the Purchase Price during this period, then during the time it takes to reach final judgment and to finally resolve the appeals of the final judgments, the Estate would be deprived of its ownership of the Shares, and Acquisition Trust might sell the Shares to a good faith purchaser for value in a way that cannot be undone after appeal of the final judgment. This would prevent the Estate from obtaining on appeal from the final judgment a rendition of judgment declaring that the Estate owns the Shares. Thus, mandamus relief in this case will preserve the Estate's substantive rights as owner

31

of the Shares from impairment or loss. *See In re Van Waters & Rogers, Inc.*, 145 S.W.3d 203, 211 (Tex. 2004) (stating that a party has no adequate appellate remedy by appeal from a final judgment if the appellate courts would not be able to cure the error on appeal); *In re Warrior Energy Servs. Corp.*, 599 S.W.3d 110, 118 (Tex. App.—Houston [14th Dist.] 2020, orig. proceeding); (concluding that the benefits of mandamus relief outweighed detriments in part because the challenged order erroneously deprived a party of the use of its money); *In re Fuentes*, 530 S.W.3d 244, 252 (Tex. App.—Houston [1st Dist.] 2017, orig. proceeding) (holding that party claiming to be owner of three properties had no adequate remedy at law because appeal from final divorce decree could not remedy being dispossessed of the properties during the appeal); *In re Ringo Drilling I, L.P.*, 369 S.W.3d 707, 708–09 (Tex. App.—Dallas 2012, orig. proceeding) (concluding that relator had no adequate remedy at law as to the trial court's interlocutory order that erroneously ordered relator to deliver to a real party in interest certain drilling rigs that were the subject of claims in the case); *In re Argyll Equities, LLC*, 227 S.W.3d 268, 273 (Tex. App.—San Antonio 2007, orig. proceeding) (holding that relator had no adequate remedy by appeal as to a prejudgment attachment order that erroneously froze the company's assets and hindered its ability to conduct business); *In re Texas American Exp., Inc.*, 190 S.W.3d 720, 727–28 (Tex. App.—Dallas 2005, orig. proceeding) (holding there was no adequate remedy at law from a prejudgment writ of garnishment because it erroneously deprived the relator of the possession of its property and no available legal remedy allowed the relator to reobtain possession of its property).

In addition, if the Estate were to decide that it is in its best interests to seek a fairness opinion within sixty days after Acquisition Trust paid the Purchase Price under the Judgments, obtaining this opinion in a sixty-day period would be a substantial expense that would be wasted when the Judgments were reversed on

appeal from final judgments. The trial court's error in determining that Acquisition Trust has been the owner of the Shares since the Date also would likely cause reversible error in the adjudication of remaining claims in the trial court, for example (1) the claims the Executor asserts in the First Case against Caldwell, Gary, Web, and Acquisition Trust, including the claims assigned to the Executor by the Bentley Parties,[14] and (2) the claims asserted by the Company against Gary, Web, Diversified, and Caldwell in the Third Case.[15] Thus, mandamus relief will spare the litigants and the public the time and money that would be wasted seeking a fairness opinion and litigating claims that would eventually be reversed on appeal from the final judgments. *See In re Ubican Global, Inc*., Nos. 01-21-00356-CV, 01-21-00293-CV, 2021 WL 4533281, at *9 (Tex. App.—Houston [1st Dist.] Oct. 5, 2021, orig. proceeding) (mem. op.). We conclude that the benefits of mandamus review outweigh the detriments and that the Gruss Parties have no adequate remedy at law. *See In re Van Waters & Rogers, Inc.*, 145 S.W.3d at 211; *In re Ubican Global, Inc*., 2021 WL 4533281, at *9; *In re Warrior Energy Servs. Corp*., 599 S.W.3d at 118; *In re Fuentes*, 530 S.W.3d at 252; *In re Ringo Drilling I, L.P.*, 369 S.W.3d at 708–09; *In re Argyll Equities, LLC*, 227 S.W.3d at 273; *In re Texas American Exp., Inc.*, 190 S.W.3d at 727–28.

## III. CONCLUSION

Under the unambiguous language of the Agreement, section 4's last sentence only applies if the Estate is not able to attend a physical closing. No trial evidence shows that the Estate was not or is not able to attend a physical closing. In finding of fact 27 the trial court abused its discretion and contradicted the Agreement's unambiguous language by concluding that to have specific authority to have the

---

[14] *See* page 4 above.

[15] *See* page 6 above.

stock issued "without any right to protest or relief" by the Estate, Acquisition Trust merely had to make "provisions to provide the [Purchase Price]."

There is no trial evidence that (1) the Estate transferred possession, ownership, and control of the Shares to Acquisition Trust on the Date; (2) on the Date, Acquisition Trust took physical possession and delivery of the Stock Certificate; (3) the Stock Certificate was delivered by providing Gary Gallagher with a copy of the certificate; and (4) as a member of the board of trustees of Acquisition Trust, Caldwell retained the original Stock Certificate. Therefore, the trial court clearly abused its discretion by ruling that the Shares are in the possession, ownership, and control of Acquisition Trust and in failing to declare that the Estate owns the Shares.

There is no trial evidence to support the trial court's findings in fact finding 28 and 31 that the Closing commenced on the Date. The trial court clearly abused its discretion in determining that the Closing had commenced on this Date and had not been completed as of the date of the Judgments. Because the Estate and Acquisition Trust entered into the Agreement without explicitly mentioning a time for them to agree to a date and time for the Closing, we imply a reasonable time for the parties to do so. Thus, the question regarding reasonable time for performance is not what constitutes a reasonable time for Acquisition Trust to pay the Purchase Price, the question is what constitutes a reasonable time for the parties to agree to a date and time for the Closing. The trial evidence shows as a matter of law that in light of the circumstances before the Estate and Acquisition Trust on the Date, considering all the circumstances surrounding the adoption of the Agreement, the situation of the parties, and the Agreement's subject matter, a reasonable time for the parties to agree to a date and time for the Closing had passed by the time the trial court issued the Judgments. The Agreement has expired. The Estate has no

34

obligation to sell, transfer, or convey the Shares to Acquisition Trust under the Agreement, and Acquisition Trust has no obligation to purchase the Shares from the Estate or to pay the Purchase Price.

For the reasons stated above, we conclude that the trial court clearly abused its discretion by issuing paragraphs 3 through 5 of the Judgments and by failing to declare that the Estate owns the Shares. The benefits of mandamus review outweigh the detriments, and the Gruss Parties have no adequate remedy at law. Thus, we conditionally grant the petition for writ of mandamus in part, and we direct the trial court to (1) vacate paragraphs 3 through 5 in each of the Judgments and (2) issue interlocutory judgments in each of the three trial court cases declaring that the Estate owns the Shares. To the extent that the Gruss Parties seek mandamus relief beyond that granted in this opinion, we deny the mandamus petition. We are confident the trial court will act in accordance with this opinion. The writ of mandamus will issue only if the trial court fails to do so.

/s/    Randy Wilson
Justice

Panel consists of Justices Wise, Poissant, and Wilson.